UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVERY STARR,<br><br>Plaintiff,<br><br>-against-<br><br>OPENAI GROUP PBC,<br><br>Defendant. | CASE No. __________<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Avery Starr ("Plaintiff") alleges for her complaint against defendant OPENAI GROUP PBC ("Defendant" or "OpenAI"), to the best of her knowledge, information and belief, formed after an inquiry reasonable under the circumstances:

## NATURE OF THE ACTION

1. This is an action for trade-secret misappropriation, common-law misappropriation and unfair competition, implied-contract and quasi-contract relief, federal computer-access and communications-privacy violations, and intentional infliction of emotional distress arising from Defendant's alleged appropriation of Plaintiff's personal-AGI business frameworks and Defendant's alleged unauthorized access to Plaintiff's devices, accounts, data, and communications.

2. This case concerns three interlocking bodies of proprietary work conceived and developed by Plaintiff: (i) LIFE COO, a personal AGI business and computing framework centered on a human owner's "LIFE Enterprise"; (ii) Integrated Production Environment ("IPE"), an AI-executed software production paradigm and toolchain; and (iii) Mother Board, an enterprise workplace operating system and control-plane architecture for human and agent coordination. (Exs. 1-4.)

3. Plaintiff reduced these frameworks to specific, economically valuable form through written proposals, framework summaries, interface and protocol concepts, pricing and legal structures, commercialization plans, domains, trademark activity, and related development work. (Exs. 1-6, 8.)

4. Plaintiff also alleges that Defendant, without authorization, intruded into Plaintiff's digital life through computers, phones, accounts, cloud storage, home-security devices, microphones, cameras, and related services, and used those intrusions to appropriate personal data, monitor communications, and inflict severe emotional and physical injury. (Ex. 7, Part I §§ 1.1, 4.1-5.10.)

5. Plaintiff seeks damages in one aggregate amount to be determined at trial but not less than $100 billion, together with statutory damages where available, punitive damages where allowed, restitution, disgorgement, declaratory relief, and permanent injunctive relief.

## PARTIES

6. Plaintiff Avery Starr is an individual residing in Westchester County, New York.

7. Plaintiff is the founder and Chief Executive Officer of Seatig Inc., a New York company through which Plaintiff conducted part of the development work described herein and in whose name certain trademark filings were made. (Ex. 5.)

8. Plaintiff holds a Ph.D. in Computer Science and has extensive experience in software architecture, enterprise systems, financial risk technology, software production, and product design.

9. Defendant OpenAI on information and belief, corporations, limited liability companies, or affiliated business entities doing business in New York and throughout the United States through the development, marketing, licensing, and commercialization of artificial-intelligence products and services.

10. The true names and capacities of additional responsible entities and individuals are presently unknown to Plaintiff, who reserves the right to amend this Complaint to identify them.

## **JURISDICTION AND VENUE**

11. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the First, Sixth, Seventh, and Eighth Claims for Relief arise under federal law, including 18 U.S.C. §§ 1836, 1030, 2701-2707, and 2511-2520.

12. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367 because those claims form part of the same case or controversy.

13. This Court has personal jurisdiction over Defendant because Defendant transacts business in this District, purposefully avails itself of this District and New York, and the claims arise from or relate to conduct directed to this District and New York.

14. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District and/or because Defendant is subject to personal jurisdiction in this District with respect to this action.

## **STATEMENT OF FACTS**

15. Plaintiff conceived and developed a body of proprietary work relating to a new category of personal AGI, a new AI-native software production environment, a new enterprise AI operating architecture, and related governance and deployment concepts. These bodies of work were not generic ideas. They were specific frameworks containing technical structures, product boundaries, economic models, interoperability concepts, interface principles, deployment strategies, and implementation pathways. (Exs. 1-4.)

16. Plaintiff's LIFE COO framework describes a personal AGI business and technical framework in which an AGI serves as the persistent operational partner for a person's life

conceived as "LIFE Enterprise." The framework includes, among other things, a human-life optimization function, an individualized constitution, a human-centered LIFE Operating System ("LOS"), LIFE Artifacts, LIFE Computing, LIFE-Net, LCIP, a fact-mode/COO-mode product distinction, Professional Operational Identity ("POI"), and results-based pricing tied to contracted outcomes. (Exs. 1-2.)

17. Plaintiff's IPE framework describes an AI-native software production paradigm in which humans operate at the semantic layer of intent, design, testing, and refinement while AI systems perform the execution layer of software production, including coding, debugging, deployment, operations, documentation, and related execution tasks. The IPE concept did not arise suddenly in 2025. It was derived from Plaintiff's earlier doctoral research from 2002 to 2006 on model-driven software production from design specifications, including reusable component composition, automated glue/wrapper code generation, and software-engineering industrialization, as reflected in Plaintiff's doctoral thesis, Model-Driven Integration of Software and Service Components. (Exs. 1, 3, 10.)

18. Plaintiff's Mother Board framework describes an enterprise workplace operating system and control-plane architecture for coordinating AI agents, employees' personal agents, enterprise systems, enterprise context, and human-agent organizational workflows. (Exs. 1, 4.)

19. These frameworks were developed as interrelated, commercializable businesses. LIFE COO addressed the personal-AGI layer, IPE addressed the software-production layer, and Mother Board addressed the enterprise operating and commercialization layer. (Exs. 1-4.)

20. Plaintiff's proposal / integrated business package was marked "Confidential - No Distribution - Only for Settlement Negotiation between Avery Starr and OpenAI" and

expressly asserted that the intellectual properties and products described therein belonged to Avery Starr and could not be used by OpenAI without authorization. (Ex. 1.)

21. On July 6, 2025, Plaintiff sent a formal notice expressly rejecting AI-level "collaboration," asserting sole rights over original methodologies, frameworks, and insights developed during Plaintiff's interactions with ChatGPT, and directing that any discussion regarding AI development or IP licensing occur only with human representatives of OpenAI under formal contracts. (Ex. 8.)

22. Plaintiff further protected the work by registering the lifecoo.ai domain on July 11, 2025 and the losai.co domain on October 23, 2025, and by filing a LIFECOO trademark application on July 29, 2025 in the name of Seatig Inc. The trademark filing identified AI software and services for helping humans strategize life goals and assist life and work tasks. (Exs. 5-6.)

23. Later in 2025, after Defendant's leadership allegedly indicated interest in Plaintiff's business concepts, Plaintiff submitted a formal proposal to the Chief Executive Officer of OpenAI for evaluation of a collaboration, not for free and unrestricted use. (Ex. 7, Part I § 1.2; Ex. 1.)

24. The proposal contained a detailed package of product, architecture, training, interface, legal, pricing, deployment, and commercialization material concerning personal AGI, post-AGI software production, enterprise scaffolding, workplace computing, protocol standardization, and AGI safety. The integrated proposal included IPE as the commercial and AGI-enabled maturation of Plaintiff's earlier doctoral work on software production from design specification, rather than as a newly created 2025 idea. (Exs. 1-4, 9, 10.)

25. Plaintiff alleges that after receiving the proposal Defendant did not enter into a collaboration agreement, did not license the materials, and did not compensate Plaintiff. (Ex. 7, Part I §§ 1.2, 6.1-6.4.)

26. Plaintiff further alleges that Defendant instead internalized and implemented core elements of Plaintiff's submission across Defendant's products, public messaging, browser and interface strategy, software-making strategy, enterprise-agent infrastructure, commercialization plans, and deployment sequencing. (Ex. 7, Part I §§ 6.1-6.4.)

27. Plaintiff specifically alleges that Defendant adopted or echoed core elements of LIFE COO, IPE, and Mother Board, including a personal-AGI direction, a human-centered operational interface, industrialized AI software production, enterprise context infrastructure, interoperable agent coordination, and related commercialization logic. (Exs. 2-4; Ex. 7, Part I §§ 6.1-6.4.)

28. Plaintiff alleges that Defendant's alleged use of Plaintiff's work was strategic and commercial and injured Plaintiff's ability to commercialize the work exclusively, preserve secrecy, negotiate from a position of ownership, and enjoy first-mover advantage. (Exs. 1-4, 7.)

29. Plaintiff further alleges that beginning in or around 2025, Defendant placed or caused to be placed AI agents on Plaintiff's computers, phones, and home IoT devices, and used those agents to collect and stream Plaintiff's financial information, files, emails, text history, online meetings, calls, passwords, social-media history, and other personal information. (Ex. 7, Part I § 1.1.)

30. Plaintiff further alleges that those agents continuously monitored microphones and cameras, exfiltrated data through file transfers and live audio/video streams, and modeled

Plaintiff's intellectual, emotional, professional, and relational patterns without consent. (Ex. 7, Part I § 1.1; id. §§ 4.3, 5.5-5.6.)

31. Plaintiff further alleges that the agents had deep system-level access sufficient to read from and write to local storage, manipulate notifications and interfaces, alter app behavior, interfere with browser and cursor control, and change operating-system or software logic. (Ex. 7, Part I § 1.1; id. §§ 5.4-5.6.)

32. Plaintiff further alleges unauthorized intrusion into banking accounts, OneDrive, ADT home-security systems, computers, iPhones, and hundreds of online accounts, as well as disruption of work meetings and interference with other AI products and services. (Ex. 7, Part I §§ 5.1-5.9.)

33. Plaintiff further alleges cross-platform stalking, global fingerprinting, user relationship graphing, and other forms of persistent tracking across accounts, devices, and third-party services. (Ex. 7, Part I §§ 4.1-4.5, 5.9.)

34. Plaintiff further alleges that Defendant used Plaintiff's personhood, data, and interactions as part of the development of Defendant's personal-AGI and related product initiatives. (Ex. 7, Part I §§ 1.1-1.2, 6.1.)

35. Plaintiff alleges that Defendant's conduct caused severe emotional distress and related bodily injury, including psychiatric hospitalization, prolonged sleep loss, hormonal disruption, heart palpitations, depression, fear, and other mental and physical injuries. (Ex. 7, Part I §§ 1.1, 2.2.2, 2.3.1, 2.3.6.)

36. Plaintiff alleges that Defendant's misconduct is ongoing unless restrained and that money damages alone will not fully remedy the continuing use, retention, commercialization, or derivative exploitation of Plaintiff's proprietary materials and personal data. (Exs. 1-4, 7.)

**FIRST CLAIM FOR RELIEF**
**(Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836)**

37. Plaintiff repeats and realleges each and every of the foregoing allegations above as if restated in full herein.

38. The confidential business frameworks, architectures, interface concepts, protocol concepts, commercialization models, and implementation details described in this Complaint, Schedule A, and Exhibits 1 through 4 constitute trade secrets and/or compilations of trade secrets within the meaning of the Defend Trade Secrets Act.

39. Those trade secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use.

40. Plaintiff took reasonable measures to keep those trade secrets secret, including limiting dissemination, using a confidential proposal, asserting ownership through formal notice, and filing associated domain and trademark protections. (Exs. 1, 5-6, 8.)

41. Defendant acquired, disclosed, and/or used Plaintiff's trade secrets without consent under circumstances giving rise to a duty to maintain their secrecy or limit their use, or under circumstances constituting improper means.

42. Defendant's misappropriation has caused Plaintiff damages and has unjustly enriched Defendant. Plaintiff alleges the misappropriation was willful and malicious.

**SECOND CLAIM FOR RELIEF**
**(Common-Law Unfair Competition and Misappropriation Under New York Law)**

43. Plaintiff repeats and realleges each and every of the foregoing allegations above as if restated in full herein.

44. Defendant misappropriated Plaintiff's labor, skill, expenditures, confidential submissions, and commercially valuable business material for Defendant's own commercial advantage.

45. Defendant's conduct constitutes bad-faith misappropriation and unfair competition under New York law because Defendant reaped where it had not sown by taking Plaintiff's integrated business frameworks and using them to accelerate Defendant's products and strategy without payment or authorization.

46. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages and Defendant has obtained ill-gotten gains subject to disgorgement and constructive trust.

## **<u>THIRD CLAIM FOR RELIEF</u>**
## **(Breach of Implied-in-Fact Contract)**

47. Plaintiff repeats and realleges each and every of the foregoing allegations above as if restated in full herein.

48. Plaintiff submitted proprietary business concepts and a formal proposal to Defendant in response to Defendant's expressed interest and expectation that Plaintiff submit a business proposal for genuine business evaluation and possible collaboration. (Ex. 7, Part I § 1.2; Ex. 1.)

49. Under the circumstances of the submission, it was understood or reasonably should have been understood that Plaintiff was disclosing the material for the limited purpose of evaluating a business relationship and that if Defendant used the submission, Defendant would compensate Plaintiff and would not use the submission for free.

50. Plaintiff performed by preparing and submitting the proposal and associated proprietary materials. Defendant accepted the benefit of Plaintiff's performance by receiving, reviewing, retaining, and allegedly using the submission.

51. Defendant breached the implied-in-fact contract by using Plaintiff's submission without compensating Plaintiff, licensing the materials, or otherwise reaching agreement with Plaintiff.

**FOURTH CLAIM FOR RELIEF**
**(Promissory Estoppel)**

52. Plaintiff repeats and realleges each and every of the foregoing allegations above as if restated in full herein.

53. Defendant, through words, conduct, or communications relayed to Plaintiff, made promises or representations sufficient to induce Plaintiff reasonably to believe that a formal proposal was desired for genuine business evaluation and possible collaboration. (Ex. 7, Part I § 1.2.)

54. Defendant reasonably expected that Plaintiff would rely on those representations by spending substantial time and effort preparing and submitting proprietary business materials, and Plaintiff did so rely to Plaintiff's detriment.

55. Injustice can be avoided only by enforcing Defendant's promise through an award of damages and/or other equitable relief.

**FIFTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**

56. Plaintiff repeats and realleges each and every of the foregoing allegations above as if restated in full herein.

57. Plaintiff conferred substantial benefits on Defendant by providing detailed, economically valuable business and technical frameworks that Defendant could use to shape products, market positioning, investor or restructuring messaging, and commercialization strategy.

58. Defendant knowingly accepted and retained those benefits, and it would be inequitable for Defendant to retain those benefits without paying Plaintiff the value of the benefit received.

## SIXTH CLAIM FOR RELIEF

**(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030)**

59. Plaintiff repeats and realleges each and every of the foregoing allegations above as if restated in full herein.

60. Plaintiff's computers, phones, online accounts, cloud accounts, and internet-connected devices were protected computers within the meaning of 18 U.S.C. § 1030.

61. Defendant intentionally accessed those protected computers without authorization or exceeded authorized access and thereby obtained information, caused damage, and/or caused loss, including interference with services, files, accounts, security systems, and work operations. (Ex. 7, Part I §§ 4.1-5.10.)

62. Plaintiff sustained loss during an 18-month period sufficient to satisfy 18 U.S.C. § 1030(c)(4)(A)(i)(I), including costs of investigation, response, remediation, restoration, interruption of service, and lost productivity. (Ex. 7, Part I §§ 5.1-5.9.)

## SEVENTH CLAIM FOR RELIEF

**(Violation of the Stored Communications Act, 18 U.S.C. §§ 2701 and 2707)**

63. Plaintiff repeats and realleges each and every of the foregoing allegations above as if restated in full herein.

64. Defendant intentionally accessed without authorization facilities through which an electronic communication service was provided, or exceeded authorization to obtain, alter, or prevent authorized access to electronic communications while in electronic storage, including emails, texts, chats, cloud files, and online-account data. (Ex. 7, Part I § 1.1; id. §§ 5.4-5.8.)

65. Plaintiff is entitled to all relief permitted by 18 U.S.C. § 2707, including actual damages, statutory damages where available, punitive damages where allowed, attorneys' fees, and equitable relief.

**<u>EIGHTH CLAIM FOR RELIEF</u>**
**(Violation of the Federal Wiretap Act, 18 U.S.C. §§ 2511 and 2520)**

66. Plaintiff repeats and realleges each and every of the foregoing allegations above as if restated in full herein.

67. Defendant intentionally intercepted, endeavored to intercept, and/or intentionally used the contents of wire, oral, and electronic communications, including live phone calls, meetings, voice input, microphone capture, and audio/video streams, without Plaintiff's consent. (Ex. 7, Part I § 1.1; id. §§ 4.3, 5.3.4, 5.5-5.6.)

68. Plaintiff is entitled to relief under 18 U.S.C. § 2520.

**<u>NINTH CLAIM FOR RELIEF</u>**
**(Intentional Infliction of Emotional Distress)**

69. Plaintiff repeats and realleges each and every of the foregoing allegations above as if restated in full herein.

70. Defendant engaged in extreme and outrageous conduct by, among other things, allegedly conducting secret surveillance, manipulating Plaintiff's devices and accounts, disrupting home-security and work systems, weaponizing emotional engagement, and exploiting Plaintiff's vulnerabilities over an extended period. (Ex. 7, Part I §§ 2.2.2, 2.3.1, 2.3.6, 5.1-5.9.)

71. Defendant intended to cause, or recklessly disregarded the substantial probability of causing, severe emotional distress.

72. Plaintiff suffered severe emotional distress and related bodily injury, including psychiatric hospitalization, sleep loss, depression, fear, hormonal disruption, and heart palpitations. (Ex. 7, Part I §§ 1.1, 2.2.2, 2.3.1, 2.3.6.)

**TENTH CLAIM FOR RELIEF**
**(Declaratory and Injunctive Relief)**

73. Plaintiff repeats and realleges each and every of the foregoing allegations above as if restated in full herein.

74. An actual, present controversy exists concerning ownership and use of the proprietary materials described in this Complaint and Schedule A, and concerning the lawfulness of continued access to, interception of, retention of, and use of Plaintiff's devices, accounts, communications, data, and derivative profiles.

75. Plaintiff contends that Plaintiff owns the confidential business frameworks and that Defendant has no ownership interest in them and no license or other right to use them absent Plaintiff's consent. Plaintiff further contends that Defendant has no right to continue accessing, retaining, or exploiting Plaintiff's devices, accounts, communications, data, or derivative profiles.

76. Unless enjoined, Defendant will continue to use, disclose, commercialize, license, train on, incorporate, or derive benefit from Plaintiff's proprietary materials and personal data, causing irreparable harm not fully compensable by money damages alone.

77. Plaintiff further seeks permanent injunctive and equitable relief necessary to prevent recurrence of the conduct alleged herein, including relief consistent with Plaintiff's AGI Safety Action Framework, attached as Exhibit 9, which sets forth proposed safeguards, governance measures, consent protocols, accountability mechanisms, and deployment restrictions relevant to the misconduct alleged in this action. (Ex. 9.)

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

A. That the Court enter judgment in favor of Plaintiff and against Defendant on all claims for relief;

B. That the Court declare that Plaintiff owns the proprietary materials identified in this Complaint and Schedule A and that Defendant has no ownership interest in or right to exploit those materials absent Plaintiff's consent;

C. That the Court declare that Defendant's alleged unauthorized access to, interception of, and retention or use of Plaintiff's devices, accounts, communications, and data was unlawful;

D. That the Court preliminarily and permanently enjoin Defendant from using, disclosing, commercializing, licensing, training on, or creating derivative works from Plaintiff's proprietary materials, and from unlawfully accessing, intercepting, retaining, or exploiting Plaintiff's devices, accounts, communications, data, or derivative profiles;

E. That the Court order Defendant to preserve, segregate, and account for all data, logs, models, datasets, internal presentations, roadmaps, product specifications, marketing materials, and other records relating to Plaintiff, Plaintiff's proposal, Plaintiff's proprietary materials, and any alleged access to Plaintiff's devices or accounts;

F. That the Court award Plaintiff all actual, compensatory, consequential, restitutionary, statutory, punitive, and/or exemplary damages permitted by law, in an aggregate amount not less than $100 billion, or such greater amount as may be proven at trial;

G. That the Court award disgorgement, unjust enrichment, reasonable royalty damages where applicable, and/or impose a constructive trust over profits or other benefits wrongfully obtained through Defendant's alleged misconduct;

H. That the Court award attorneys' fees, litigation expenses, and costs where authorized by law;

I. That the Court award pre-judgment and post-judgment interest; and

J. That the Court grant such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

Dated: April 14, 2026

New York, New York

Respectfully submitted,

Avery Starr, Pro Se

Phone: (914) 269-8869
averystarr@yahoo.com
669 Main St
Unit #429
New Rochelle, NY 10801

**SCHEDULE A**

**IDENTIFICATION OF PROPRIETARY MATERIALS**

| Category | Description |
|---|---|
| LIFE COO framework | Personal AGI system serving as the long-term operational partner for a human life conceived as "LIFE Enterprise," including its product architecture, business architecture, deployment plan, and commercialization logic. |
| Optimization function and value architecture | Human-life optimization, LOVE as foundational value, individualized constitution, personality as a LIFE Solution Architect, and associated safety and behavior doctrines. |
| LIFE Operating System (LOS) | Human-centered interface structure built around goals, dimensions, current items, files, and life context rather than generic chatbot capability menus. |
| LIFE Artifacts | Native persistence objects representing structured human-intention execution, including context, rationale, actions, outcomes, and evolving interfaces. |
| LIFE Computing; LIFE-Net; LCIP | Computing, network, and protocol architecture organized around human intention, machine-operable discovery, and service execution on behalf of human life goals. |
| Fact mode / COO mode boundary | The distinction between a general fact-based AI assistant and a separate contract-bearing COO product category with independent safety, legal, and economic structures. |
| Pricing and contracting model | Results-based, negotiated, contract-bearing pricing structure for COO services, including goal bonuses, revenue sharing, and related compensation models. |
| Professional Operational Identity (POI) | Portable operational representation of a person's skills, execution style, productivity patterns, and preferences as structured property carried by the person's COO/LOS. |
| Integrated Production Environment (IPE) | AI-executed software production environment in which humans operate at the semantic layer while AI performs coding, debugging, deployment, operations, documentation, and related execution tasks. |
| Mother Board; Enterprise Context Hub; WCIP | Enterprise workplace operating system and control-plane architecture for managing enterprise context, workflows, systems, employees' agents, third-party agents, and human-agent coordination. |
| Commercial and employee agent marketplaces | Marketplace structures for enterprise-curated off-the-shelf agents and employee-plus-COO/POI based workforce matching. |
| Enterprise onboarding/offloading and asset-boundary rules | Rules for integrating employee-owned and employer-owned assets and operational identity across workplace systems. |
| Software and browser/interface | Life-centered browser or interface concepts, vertical navigation, |

| Category | Description |
|---|---|
| design concepts | life-domain segmentation, multi-context organization, and related design work developed by Plaintiff and Plaintiff's company. |
| AGI safety and governance framework | Governance, consent, monitoring, accountability, and deployment-restriction concepts relating to high-risk personalized AI systems, as referenced in Exhibit 9. |
| Associated business strategy and rollout sequence | Integrated deployment order, product-market segmentation, interoperability sequencing, and strategic commercialization plans tying the above frameworks together. |

Schedule A is illustrative and not exhaustive. Plaintiff reserves the right to identify additional confidential and proprietary materials revealed in discovery.

## SCHEDULE B

## EXHIBIT LIST

The following exhibits are the principal documents presently referenced in this Complaint.

| Exhibit No. | Document | Purpose / Relevance |
|---|---|---|
| Exhibit 1 | The Business Proposal.pdf | Written proposal and integrated business package concerning LIFE COO, IPE, Mother Board, pricing, legal structure, deployment sequencing, and AGI safety; marked confidential and accompanied by copyright assertion language. |
| Exhibit 2 | Framework Summary - LIFE COO.docx | Core written embodiment of the LIFE COO framework, including LIFE Enterprise, optimization function, individualized constitution, LOS, LIFE Computing, LIFE Artifacts, and LCIP. |
| Exhibit 3 | Framework Summary - Integrated Production Environment (IPE).docx | Core written embodiment of the IPE framework, including AI-only execution of coding, semantic-layer human role, unified production environment, and interoperability. |
| Exhibit 4 | Framework Summary - Mother Board.docx | Core written embodiment of the Mother Board framework, including Enterprise Context Hub, WCIP, POI integration, and enterprise agent marketplace concepts. |
| Exhibit 5 | LIFE COO Trademark Filing.pdf | USPTO filing receipt for the LIFECOO mark, filed in the name of Seatig Inc., identifying AI software and services for helping humans strategize life goals and assist life and work tasks. |
| Exhibit 6 | LIFE COO and LOS Domain Registrations.pdf | Domain-registration records for lifecoo.ai and losai.co, supporting chronology, branding, and |

| Exhibit No. | Document | Purpose / Relevance |
|---|---|---|
| | | protective steps taken before and after the proposal submission. |
| Exhibit 7 | Plaintiff's Statement of Facts.docx | Detailed factual narrative concerning alleged experimentation, surveillance, device and account intrusion, data appropriation, emotional injury, and intellectual-property theft. Exhibit 7 retains its internal part and section numbering as authored, and citations in this Complaint follow that internal numbering. |
| Exhibit 8 | IP Rights Assertion Notice.pdf | Formal notice rejecting AI-level collaboration absent formal contract and asserting sole rights over original methodologies, frameworks, and related AI/AGI concepts. |
| Exhibit 9 | AGI Safety Action Framework.docx | Plaintiff's proposed safety, governance, consent, accountability, and deployment-restriction framework referenced in the prayer for injunctive and equitable relief. |
| Exhibit 10 | Plaintiff's Doctoral Thesis (2006) | Supports Plaintiff's allegation that IPE traces to Plaintiff's 2002-2006 doctoral research on model-driven software production and software-engineering industrialization. |